Filed 5/20/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062770 |
| v. | (Super. Ct. No. RIF2003152) |
| ANDRE DIMITRI RICHEE et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeals from judgments of the Superior Court of Riverside County, Matthew C. Perantoni, Judge. Affirmed in part, reversed in part, and remanded.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant Andre Dimitri Richee.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Lee Albert Mooring.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

In this high-stakes criminal case, the trial court committed serious instructional errors: it instructed the jury on invalid theories of murder and attempted murder under the natural and probable consequences doctrine, and it failed to instruct the jury on *any* of the elements of a special circumstance charge, even after the jury inquired. After receiving the court's instructions, the jury found appellants Andre Dimitri Richee and Lee Albert Mooring guilty of special circumstances murder and two counts of attempted murder. The court sentenced them to life in prison without the possibility of parole, plus additional prison terms.

The trial court's mishandling of the jury instructions undermined appellants' rights to a jury trial. The error involving the natural and probable consequences doctrine requires us to reverse appellants' convictions for attempted murder. As to appellants' convictions for murder and the special circumstance findings, we conclude the court's instructional errors were harmless beyond a reasonable doubt.[1]

We are mindful of the time pressures trial judges face, but we take this opportunity to remind our trial courts of the critical role jury instructions play. The court's instructions are the lens through which jurors evaluate evidence and apply the law. Accordingly, the correctness of the instructions is critical to providing a fair trial.

---

[1] We reject Richee's further claim that the trial court committed an evidentiary error. But we accept the parties' agreement that despite failing to say so expressly, the court intended its imposition of victim restitution to apply to appellants jointly and severally, rather than imposed in full against each of them. Because we vacate the sentences and remand for further proceedings, we need not amend the judgments accordingly.

FACTS

I.

THE INFORMATION

The Riverside County District Attorney's Office charged appellants with the murder of Daniel Gonzalez (count 1) and the "willful, deliberate and premeditated" attempted murders of A.P. and D.M. (counts 2 & 3), all committed in September 2020. The murder charge included a special circumstance allegation, asserting that appellants committed the murder by intentionally firing from a vehicle at a person outside the vehicle, with the intent to kill (Pen. Code, § 190. 2, subd. (a)(21); the drive-by special circumstance).[2]

The information also alleged that in committing the attempted murders, Richee personally and intentionally discharged a firearm (§ 12022.53, subd. (c)). And it included allegations concerning Mooring's prior convictions. The matter proceeded to a joint jury trial in August 2022.

II.

THE EVIDENCE AT TRIAL

*A. The Shooting*

On the evening of September 7, 2020, Gonzalez, A.P., and D.M. were socializing with a group of other friends in an alley near an apartment complex. At some point, a white sedan with tinted windows sped down the alley and suddenly stopped by the group. The driver's side faced the group. The man in the front passenger seat stuck his head out of the window and over the roof and yelled, "Do you guys bang?" Group members interpreted the question as asking if they were in a gang. Gonzalez replied: "No. Just family

_____

[2] Undesignated statutory references are to the Penal Code.

here hanging out." No one else from the group responded to the man's question. The car then sped off.

Shortly after, the same car returned and slowed down by the group before speeding away. Some group members became scared and left. The car then returned from the other direction, with its headlights off. It stopped in front of the group, about two feet away, and at least one occupant on the passenger side started shooting. Gonzalez was hit in the head and killed. A.P. and D.M. were both injured.

The first 911 call about the shooting came in at 9:07 p.m., and police responded to the scene. Witnesses later described hearing as many as 25 shots, and police collected 16 nine-millimeter bullet casings from the scene. Accounts of the number of shooters varied.[3]

B. Identification Evidence

At trial, one witness identified the man who had stuck his head out of the window as Richee. But when confronted with his inconsistent photo lineup identification, this witness said he could have been wrong about his identification of Richee. Other witnesses identified the man as Mooring.

Surveillance footage from a nearby liquor store showed a white car matching the one used in the shooting parking in front of the store at 8:44 p.m. Richee exited the car from the front passenger door, and Mooring exited from the driver's door; both men entered the store. They returned to

---

[3] One witness testified there had been two shooters, though he had seen only one gun and had previously told an officer there had been four shooters. Another witness testified that he had seen two guns emerge from the passenger-side windows, but he had previously told an investigator there were three shooters.

4

the car minutes later, entering through the same doors, and the car left the store parking lot at 8:48 p.m.

At trial, an investigator with the Riverside County Sheriff's Office testified it would have taken less than two minutes to drive from the liquor store to the site of the shooting. In response to questioning, he agreed there would have been enough time for the car's occupants to change positions.

*C. Richee's Girlfriend*

In September 2020, Richee was living with his girlfriend (Girlfriend) and their two children. Between 12:30 and 1:00 a.m. on September 8, Girlfriend came home from work to find police all around the area. When she walked inside, her apartment was a mess and smelled like bleach. She asked Richee about it and started "fussing with him." She then discovered that he had poured bleach over clothes in the bathtub.

In a subsequent field interview with Sheriff's Office investigators, Girlfriend became emotional. After acknowledging they were speaking with her because of "[a] shooting," she described her conversation with Richee about the mess and the smell of bleach. When asked what Richee had told her, she replied, "That he did it." Girlfriend could not believe this because Richee was "not that person" and was "not about these streets." At trial, Girlfriend testified that she felt one of the investigators had threatened her, and that she told the investigators what they wanted to hear.[4]

After concluding the interview, the investigators drove Girlfriend to the station and placed her in an interview room. At some point, she was

---

[4] We describe the circumstances of this interview in more detail in the discussion of Richee's evidentiary challenge.

left in the room by herself but was being monitored and recorded. During this time, Girlfriend began crying and said something to the effect of "[w]hy would you put me in this situation, me and my mom and my kids." In a search of Richee's apartment, officers observed a half-full bottle of bleach next to the bathtub.

*D. Mooring's Interview and Jail Call*

Mooring and Richee were both arrested days after the shooting. After investigators identified the white car seen in the liquor store surveillance video, they asked Mooring if he had ever driven it. Initially, he denied ever driving that car, but when confronted with a photo from the video, he eventually admitted to driving it.

While in jail, Mooring made recorded phone calls. On one call, Mooring—who had fathered a child with Richee's sister—told a woman that he would "sign for this shit" so her brother could go home. He said, "I'm not coming home no more mama" and added: "It ain't no point in everybody going to jail though. I'ma get your brother home." Later in the conversation, after the woman stated, "We haven't even talked to Andre," Mooring said: "I'm right here with him. He's next door to me."

III.

JURY INSTRUCTIONS

After the close of evidence, the trial court instructed the jury. Among other things, after instructing on the elements of murder, the court instructed on two theories of first degree murder under CALCRIM No. 521: (1) premeditation and deliberation; and (2) discharging a firearm from a vehicle.[5] And after instructing on the elements of attempted murder, the

---

[5] As to the discharge from a vehicle theory, the instruction stated:

court instructed on willfulness, deliberation, and premeditation under CALCRIM No. 601. Among other things, that instruction explained that the defendant acted willfully if he "intended to kill when he acted."

Most relevant here, the trial court instructed the jury on uncharged conspiracies and the elements of a conspiracy under CALCRIM No. 416. It then instructed under CALCRIM No. 417 (liability for conspirators' acts): "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime. [¶] A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. [¶] A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. . . . [¶] . . . [¶]

"To prove that the defendant is guilty of the crimes charged in Counts 1 through 3, the People must prove that: [¶] 1. The defendant conspired to commit one of the following crimes: Murder or Attempt[ed] Murder; [¶] 2. A member of the conspiracy committed Murder or Attempt[ed] Murder to further the conspiracy; [¶] AND [¶] 3. Murder or Attempt[ed] Murder were natural and probable consequence[s] . . . of the common plan or design of the crime that the defendant conspired to commit."

---

"The defendant is guilty of first degree murder if the People have proved that the defendant murdered by shooting a firearm from a motor vehicle. The defendant committed this kind of murder if: [¶] 1. He shot a firearm from a motor vehicle; [¶] 2. He intentionally shot at a person who was outside the vehicle; [¶] AND [¶] 3. He intended to kill that person."

7

The trial court proceeded to instruct on the personal discharge enhancement allegation against Richee. As discussed below, the court did not instruct on the elements of the drive-by special circumstance, but it later gave instructions regarding special circumstances generally, in response to a jury question.

## IV.

### CLOSING ARGUMENTS

The prosecution focused its closing argument on the issue of identity, highlighting video evidence and appellants' actions and statements after the shooting. It argued the murder was in the first degree under a theory of either premeditation or discharging a firearm from a vehicle. It asserted that Richee was one of the shooters and added, "[W]e know there were multiple shooters in the vehicle." But referencing the conspiracy instruction, the prosecution stated: "[T]he law recognizes that when something like this happens, everybody involved is . . . just as responsible. The getaway driver, the shooter, they are just as responsible as everybody who committed the crime."

Defense counsel for each appellant argued only that their respective client's identity as a perpetrator had not been proven. They did not address the elements of the crimes or the drive-by special circumstance.

## V.

### VERDICTS AND SENTENCE

Following deliberations, the jury found appellants guilty of first degree murder, with findings that the murder was premeditated and deliberate. It returned true findings on the drive-by special circumstance. The jury also found appellants guilty of both counts of attempted murder, with separate premeditation and deliberation findings. As to the

8

enhancement allegation that Richee personally discharged a firearm under section 12022.53, subdivision (c), the jury deadlocked, and the trial court declared a mistrial on the enhancement.

The trial court sentenced Richee to state prison for life without the possibility of parole, plus 14 years to life. It sentenced Mooring to life without parole, plus 50 years to life, plus 10 years.[6] Appellants timely appealed.

## DISCUSSION

Appellants contend the trial court committed instructional error by (1) instructing the jury on natural and probable consequences theories of murder and attempted murder, and (2) failing to instruct on the elements of the drive-by special circumstance. Richee also asserts the court abused its discretion by admitting evidence of his inculpatory statement to Girlfriend on the night of the shooting.

As discussed below, we agree that the trial court committed the instructional errors appellants assert. We conclude that the erroneous instruction on natural and probable consequences requires reversal of appellants' attempted murder convictions, but that the errors were harmless beyond a reasonable doubt as to the murder convictions. We find no evidentiary error.

---

[6] The trial court ordered each appellant to pay a total of $20,500 as victim restitution. As discussed, the parties agree that the court intended this imposition to apply to appellants jointly and severally, although it did not expressly say that.

9

CLAIMS OF INSTRUCTIONAL ERROR

*A. General Principles*

"The trial court has a sua sponte duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence. [Citation.]" (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331.) This includes the duty to correctly instruct on all elements of charged offenses and any special circumstance allegation. (*People v. Mil* (2012) 53 Cal.4th 400, 409.)

When the trial court gives an instruction that misstates the law, "the forfeiture rule 'does not apply,'" and the error is preserved for appellate review, even without a timely objection. (*People v. Gomez* (2018) 6 Cal.5th 243, 312.) We review claims of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We assume the jurors are intelligent people and are capable of understanding and correlating the instructions given. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

*B. Natural and Probable Consequences Instruction*

Appellants contend the trial court reversibly erred by permitting the jury to convict them of murder and attempted murder based on invalid theories of natural and probable consequences under CALCRIM No. 417's conspirator liability instruction.[7] The Attorney General responds that any

---

[7] In different parts of their briefing, appellants take inconsistent

error was harmless beyond a reasonable doubt based on the jury's findings and the state of the evidence. As discussed below, we agree with appellants that the court erred.[8] As to the murder convictions, we conclude the error was harmless beyond a reasonable doubt. But as to the attempted murders, we conclude that neither the jury's findings nor the state of the evidence establish that the error was harmless beyond a reasonable doubt. We therefore reverse those convictions.

1. Principles of Murder, Attempted Murder, and the Natural and Probable Consequences Doctrine

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "[M]alice may be express or implied." (§ 188, subd. (a).) Malice is express when the defendant acts with an intent to kill another person. (§ 188, subd. (a)(1).) "[M]alice is implied when the killing resulted from an intentional act, the natural consequences of which are dangerous to human life, performed with knowledge of and conscious disregard for the danger to human life." (*People v. Thomas* (2012) 53 Cal.4th 771, 814.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 7.) Because the doctrine of transferred intent does not apply to attempted murder, "[t]o

---

positions on whether the natural and probable consequence instruction was prejudicial as to their murder convictions. We treat their claim of reversible error as encompassing those convictions.

[8] To the extent the Attorney General maintains that appellants forfeited their challenge to the trial court's erroneous instruction by failing to object below, he is mistaken. (*People v. Gomez, supra*, 6 Cal.5th at p. 312.)

be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else." (*People v. Souza* (2012) 54 Cal.4th 90, 120 (*Souza*).)

Under traditional conspiracy law, a conspirator can be found guilty of crimes committed by coconspirators if those crimes were natural and probable consequences of the intended crime. (*People v. Luparello* (1986) 187 Cal.App.3d 410, 437.) The conspirator must simply "intend to agree or conspire and to commit the offense which is the object of the conspiracy," and liability then extends to "the actual, rather than the planned or 'intended' crime." (*Id.* at p. 439.) In the past, this doctrine extended even to murder and attempted murder charges, allowing conspirators to be held liable for their coconspirators' killings or attempted killings that were natural and probable consequences of the target crime.

Through legislation enacted in 2018 and 2021, the Legislature eliminated the natural and probable consequences theory of murder and attempted murder. (*People v. Delgadillo* (2022) 14 Cal.5th 216, 223, fn. 3 [discussing Sen. Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437; Stats. 2018, ch. 1015) and Sen. Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775; Stats. 2021, ch. 551)].)[9] Thus, convictions for express malice murder and attempted murder now require proof that the defendant personally harbored an intent to kill. (See § 188, subd. (a)(1); *People v. Das* (2023)

---

[9] Before the enactment of Senate Bill 775, California courts were divided on whether Senate Bill 1437 barred convictions for attempted murder based on a theory of natural and probable consequences, in addition to murder convictions. (*People v. Gallegos* (2024) 105 Cal.App.5th 434, 440 (*Gallegos*).) Effective January 1, 2022, Senate Bill 775 clarified that the natural and probable consequences theory could no longer support an attempted murder conviction. (*Gallegos*, at p. 441; *People v. Perez* (2022) 78 Cal.App.5th 192, 204.)

12

96 Cal.App.5th 954, 960.) And if the prosecution contends that the defendant served as an aider and abettor to the crime, it must also prove that the defendant "'aid[ed] the commission of th[e] offense with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends."' [Citation.]" (*People v. Curiel* (2023) 15 Cal.5th 433, 463 (*Curiel*) [addressing murder liability].)

Alternatively, even if the defendant neither personally committed the crime nor aided and abetted it, the prosecution may seek to establish the defendant's liability as a participant in a conspiracy to commit murder, without relying on the natural and probable consequences doctrine. (*People v. Valdez* (2012) 55 Cal.4th 82, 150 (*Valdez*) [addressing murder liability].) This theory requires proof of an agreement to commit murder, an overt act by one or more of the conspirators (*People v. Juarez* (2016) 62 Cal.4th 1164, 1169), and the commission of murder or attempted murder (of the intended murder victim) by a coconspirator in furtherance of the conspiracy (*Valdez*, at p. 150; *Souza, supra*, 54 Cal.4th at p. 120).

### 2. Instructional Error

The trial court committed instructional error. About four years after Senate Bill 1437's enactment and seven months after Senate Bill 775 took effect, the court permitted the jury to convict appellants of murder and attempted murder under invalid theories of natural and probable consequences. (*Gallegos, supra*, 105 Cal.App.5th at p. 441.) Under CALCRIM No. 417, it instructed that appellants could be guilty of murder or attempted murder based on their participation in an underlying conspiracy, if murder or attempted murder were the natural and probable consequence of the conspiracy's design. The Attorney General does not dispute that this was error. Instead, noting that the jury was also instructed on valid theories of

13

liability, the Attorney General contends the error was harmless beyond a reasonable doubt. We address this contention below.

### 3. Harmlessness Analysis

"Where a jury is instructed on alternate theories of liability, one legally valid and one legally invalid, a federal constitutional error has occurred. The defendant has been deprived of his or her right to 'a jury properly instructed in the relevant law.' [Citation.] The error therefore requires reversal unless we determine the error was harmless beyond a reasonable doubt. [Citation.]" (*In re Lopez* (2023) 14 Cal.5th 562, 580.) For the error to clear that standard, we must find that "any rational jury would have found the defendant guilty based on a valid theory if the jury had been properly instructed." (*Id.* at p. 584.) We therefore "'examine[] what the jury necessarily did find and ask[] whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' [Citation.]" (*Id.* at pp. 584–585.) "The Attorney General bears the burden of showing that the error was harmless beyond a reasonable doubt." (*Id.* at p. 585.)

We assess the convictions for attempted murder and murder separately. As discussed below, we conclude the error undermines appellants' attempted murder convictions and requires reversal. However, we conclude the error was harmless beyond a reasonable doubt as to the murder convictions.

### a. Attempted Murders

The Attorney General contends the error was harmless as to the attempted murders because: (1) the jury's findings that the attempted murders were willful, premeditated, and deliberate "foreclose the possibility that these convictions were based on the imputed mental state of a

co-conspirator" because they entail a finding of intent to kill; (2) no evidence suggested that the shooting was directed at Gonzalez, specifically, rather than at the entire group; and (3) the evidence of appellants' guilt under valid theories was overwhelming. We find none of his contentions convincing.

First, the Attorney General points to CALCRIM No. 601, which instructed the jury that to find that the attempted murders were willful, it had to find that the defendant "intended to kill when he acted." He argues that given this instruction, the jury's findings that the attempted murders were willful, premeditated, and deliberate show appellants "were convicted based on their own specific intents to kill [A.P.] and [D.M.], and not as the natural and probable consequence of a conspiracy to commit some other target offense."

The Attorney General's argument overlooks the full scope of the trial court's natural and probable consequences instruction. The jury was instructed under CALCRIM No. 417 that a conspirator was "criminally responsible for any act" of a coconspirator that furthered the conspiracy and was a natural and probable consequence of its common plan or design. The jury could reasonably have understood this instruction to encompass not only the attempted murder charges, but also the willfulness, premeditation, and deliberation findings. (*People v. Morales* (2024) 102 Cal.App.5th 1120, 1131 [natural and probable consequences instructions, including under CALCRIM No. 417, permitted jury to apply that theory to premeditation and deliberation findings].) The remainder of the instruction reinforced this interpretation by explaining what must be shown under a natural and probable consequences theory to find a defendant "guilty of the crimes charged in Counts 1 through 3." As noted, counts 2 and 3 charged appellants with "willful, deliberate and premeditated" attempted murder. The

15

interpretation was also consistent with the prosecution's statement in closing argument that coconspirators were "just as responsible" as the perpetrators.

Even accepting the Attorney General's position that CALCRIM No. 601 required finding each appellant's own "inten[t] to kill when he acted," nothing in the instruction required finding intent to kill *the attempted murder victims*. Although the phrase "when he acted" would logically refer to actions underlying each attempted murder count, the availability of a natural and probable consequences theory of attempted murder meant that these actions here could have been merely agreeing to murder Gonzalez. The jury could therefore have based its willfulness findings solely on appellants' intent to kill Gonzalez. Because the transferred intent doctrine does not apply to attempted murder, the CALCRIM No. 601 findings would not support the attempted murder convictions absent the invalid natural and probable consequences theory.[10] (*Souza, supra*, 54 Cal.4th at p. 120.)

Second, the Attorney General claims, "[N]o evidence presented at trial suggests that [Gonzalez] was the sole, or even primary target of the drive-by shooting; as opposed to an indiscriminate act of violence intended to

_____

[10] The Attorney General incorrectly assumes that an intent to kill the attempted murder victims would be sufficient, on its own, to establish a valid theory of attempted murder liability. As our Supreme Court recently clarified regarding murder liability: "[the Legislature] did not simply 'add the element of malice aforethought' to existing theories of murder liability. [Citation.] It eliminated the doctrine of natural and probable consequences in its entirety . . . . [Citation.]" (*Curiel, supra*, 15 Cal.5th at p. 462.) Thus, "[m]urder liability requires a different, valid theory, such as direct aiding and abetting." (*Ibid.*) The same principle applies to attempted murder—proving harmlessness requires establishing all elements of a valid theory of attempted murder, not merely intent to kill the victim. Regardless, as discussed, the jury's verdicts did not necessarily reflect findings of intent to kill the attempted murder victims.

16

kill every member of the victims' group." He suggests the jury therefore could not have found that appellants intended and agreed to kill only Gonzalez. We disagree.

Gonzalez alone responded to appellants' gang-related question. A rational jury could have concluded that appellants agreed only to target Gonzalez, whether because they assumed he was a rival gang member or because they viewed him as the group's leader. While the Attorney General may consider this unlikely, it is not "impossible" for a rational jury to find. (*In re Lopez, supra*, 14 Cal.5th at pp. 584–585.)

Relatedly, the Attorney General asserts that the manner in which the shooting was committed indicated an intent to kill any and all of the victims: "The perpetrators fired at least 16 rounds at the gathered group of friends, and continued to shoot towards [D.M.] and [A.P.] after [Gonzalez] was hit." But this analysis begs the question and assumes that Richee, Mooring, and any other accomplices were of one mind in committing the shooting. A nonshooter accomplice or even one of multiple shooters could have intended to kill only Gonzalez, while another person fired at D.M. and A.P.[11] Again, it is not *impossible* for a rational jury to find reasonable doubt about the Attorney General's theory.

Finally, the Attorney General contends that the evidence of appellants' guilt under valid theories was so overwhelming as to demonstrate harmlessness. The Attorney General maintains that the evidence established Mooring's role as the driver in the shooting. He asserts Mooring was properly

---

[11] As noted, witnesses gave varying accounts of the number of shooters, and even the prosecution asserted as fact that there were multiple shooters.

17

convicted of attempted murder because Mooring placed his accomplices in a position to shoot A.P. and D.M., "despite knowing their intention to open fire." And he points to Mooring's actions after the shooting—including lying to investigators and trying to shield any accomplice—as showing that he acted as an aider and abettor.

Again, the Attorney General's argument begs the question and assumes that Mooring knew about and shared the intent of the shooter(s) to kill A.P. and D.M. Assuming Mooring was the driver, the jury could have found that he intended to aid only the killing of Gonzalez. His actions after the shooting did not compel a different finding.

The Attorney General maintains that the evidence established Richee's role as "the actual shooter, and thus the direct perpetrator of the attempted murders." According to the Attorney General, Richee "confessed to his girlfriend that he was the one that did the shooting," and video evidence showing him in the front passenger seat, combined with witness testimony that gunfire came from that position, corroborated this admission. The Attorney General also points to Richee's attempt to bleach his clothing from the night of the shooting as "a transparent attempt to remove or conceal forensic evidence of his guilt." While acknowledging the jury's failure to reach a true finding on the personal discharge allegation, the Attorney General suggests this may have resulted from "'lenity, compromise, or mistake,'" citing caselaw on inconsistent verdicts.

The Attorney General's argument misses the mark. As discussed, there may have been multiple shooters involved in the incident. So even if Richee were definitively shown to be *a* shooter, the evidence would not compel a rational jury to find that he personally committed the attempted

18

murders of both A.P. and D.M.; nor would the evidence compel a finding that he even intended to kill both.

Moreover, the Attorney General overstates the evidence suggesting Richee was a shooter. While Girlfriend's statement that Richee told her "[t]hat he did it" implicated him in the drive-by shooting, this vague statement did not compel the jury to conclude that he admitted to being a shooter. Similarly, Richee's bleaching of his clothes implicated him but did not require a finding that he was a shooter: a rational jury could find it possible that Richee was concerned about blood spatter from the nearby victims—or gunpowder residue from the shooter's gun. The video showing Richee in the front passenger seat as the car was leaving the liquor store was captured about 19 minutes before the first 911 call. The brief drive from the liquor store to the shooting site—less than two minutes—left time for occupants to change positions. Thus, a rational jury was not compelled to conclude Richee was a shooter. Contrary to the Attorney General's position, the jury's deadlock on the personal discharge allegation was consistent with its other findings, and nothing suggests the deadlock resulted from "lenity, compromise, or mistake."

In short, the Attorney General has not shown that the trial court's instruction on the natural and probable consequences doctrine was harmless beyond a reasonable doubt as to appellants' attempted murder convictions. Accordingly, we must reverse those convictions.

b. Murder

We reach a different conclusion on appellants' murder convictions. To convict appellants based on the improper instruction under CALCRIM No. 417, the jury was required to find that they conspired to kill at

19

least one victim. If the jury found a conspiracy to kill only one victim, that victim was Gonzalez.

As discussed, because only Gonzalez responded to appellants' gang-related question, the jury had an evidentiary basis to conclude that appellants agreed to target him, either assuming he was a rival gang member or viewing him as the leader of the victims' group. By contrast, no evidence supported a finding that appellants conspired to kill A.P. or D.M. *but not* Gonzalez. Thus, even under the improper instruction, the jury's necessary finding of a conspiracy to kill Gonzalez—combined with the undisputed fact that a coconspirator carried out the shooting—satisfied the legal requirements for appellants' guilt under a valid theory of conspiracy to murder. (*Valdez, supra*, 55 Cal.4th at p. 150.)

Appellants claim the instructional error was prejudicial because of another flaw in the trial court's modified instruction under CALCRIM No. 417. They contend the court additionally misinstructed the jury that appellants could be guilty of murder based on their participation in a *conspiracy to commit attempted murder*, an invalid legal concept. According to appellants, this instruction allowed the jury to rely on an invalid theory when determining if an underlying conspiracy even existed. We disagree.

As appellants note, the trial court's modified instruction allowed the jury to convict appellants of murder based on their participation in a conspiracy to commit either murder *or* attempted murder. True, this reference to a conspiracy to commit attempted murder, when read strictly, is nonsensical: "[O]ne cannot conspire to *try* to commit a crime. An agreement to commit a crime is required, even if nothing more than an overt act is ultimately done." (*People v. Johnson* (2013) 57 Cal.4th 250, 264.)

20

Yet intelligent jurors would not have applied a strict reading of this concept. (*People v. Ramos, supra*, 163 Cal.App.4th at p. 1088.) The only reasonable interpretation of the trial court's imprecise phrasing was that appellants could be guilty of the charged offenses based on either successful or unsuccessful conspiracies to commit *murder*. Appellants offer no other sensible reading. This interpretation added no offense to the court's original error of instructing on the natural and probable consequences doctrine. Accordingly, we conclude the court's instructional error was harmless beyond a reasonable doubt as to appellants' murder convictions.

## C. Drive-by Special Circumstance

Appellants argue the trial court reversibly erred by failing to instruct the jury on the elements of the drive-by special circumstance. They claim the error was structural and requires automatic reversal. The Attorney General counters that the court did instruct on the special circumstance and that any error was harmless beyond a reasonable doubt.

As discussed below, the trial court indeed failed to instruct the jury on the drive-by special circumstance. Nevertheless, this error is subject to harmlessness review, and we conclude it was harmless beyond a reasonable doubt.

### 1. Background

As noted, the information charged appellants with a drive-by special circumstance under section 190.2, subdivision (a)(21). At the close of trial, the jury was provided verdict forms to decide whether either appellant committed "Discharging a Firearm from a Vehicle within the meaning of section 190.2, subdivision (a)[(21)]" during the commission of murder. Yet the trial court included no instruction concerning this allegation.

21

During deliberations, the jury submitted a note to the trial court, asking: "Is the discharging [of] a firearm from a vehicle, Penal Code section 190.2, for personally discharging or if a firearm was discharged from a vehicle?" The court requested clarification. The jury responded by submitting the following questions: (1) "Does . . . either defendant have to have personally discharged the firearm for [section] 190.2[?]" and (2) "What is the difference between . . . [sections] 190.2 and 12022.53 [the personal discharge enhancement allegation]?"

At that point, the trial court realized it had not instructed the jury on the drive-by special circumstance. After a discussion with counsel, the court brought the jury in for further instructions and instructed it with *general* instructions on special circumstances: CALCRIM. Nos. 700, 702, 704, 705, and 706. Somewhat relevant here was the court's version of CALCRIM No. 702, which instructed: "If you decide that a defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance of Discharging a Firearm from a Vehicle, you must also decide whether the defendant acted with the intent to kill. . . . [¶] The People do not have to prove that the actual killer acted with the intent to kill in order for this special circumstance to be true."[12]

The court never instructed the jury on CALCRIM No. 735, the instruction dealing specifically with the drive-by special circumstance under section 190.2, subdivision (a)(21). As noted, the jury ultimately found the special circumstance true as to each appellant.

[12] As discussed below, the pattern instruction states that courts should give it only as to special circumstance allegations under section 190.2, subdivisions (a)(2)–(6), meaning it should not be given for a drive-by allegation under subdivision (a)(21). (CALCRIM No. 702.)

22

2. Instructional Error

Section 190.2, subdivision (a)(21), provides for a special circumstance, with a penalty of death or life without parole, where: "[t]he murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person or persons outside the vehicle with the intent to inflict death." The special circumstance therefore requires proof that (1) the defendant or another principal in the murder "shot a firearm from a motor vehicle, killing [the victim]"; (2) the defendant or another principal "intentionally shot at a person who was outside the vehicle"; and (3) "[a]t the time of the shooting, the defendant intended to kill." (CALCRIM No. 735.)

The trial court's failure to instruct on these elements—even after the jury submitted questions showing it was completely in the dark about them—is baffling. It is also a "very serious constitutional error." (*People v. Merritt* (2017) 2 Cal.5th 819, 824 (*Merritt*).)

We reject the Attorney General's contention that the trial court provided "complete and correct instructions on the elements of the special circumstance." (Boldface omitted.) The Attorney General points to the court's instruction on first degree murder (CALCRIM No. 521). This instruction included discharging a firearm from a vehicle as one alternative theory of first degree murder, with similar elements to those listed in CALCRIM No. 735. But there was no reason for the jury to assume that this instruction also defined the elements of the special circumstance, simply based on the latter's title. And we know the jury did not do so because it submitted questions about the elements of the special circumstance, without referencing the first degree murder instruction.

23

The Attorney General also points to the trial court's instruction under CALCRIM No. 702, arguing that it instructed the jury on the required mens rea if it did not find that Richee was the actual killer. But this instruction did not cover all the elements of the drive-by special circumstance, and the part it purported to cover—the required mental state—was wrong. The drive-by special circumstance always requires an intent to kill. (§ 190.2, subd. (a)(21); CALCRIM No. 735.) Although some special circumstances do not require an intent to kill for the actual killer (§ 190.2, subds. (a)(2)–(6), (b)), the drive-by special circumstance is not among them. Indeed, the CALCRIM No. 702 pattern instruction itself informs courts that it should not be used for the drive-by special circumstance. Accordingly, the trial court erred by failing to instruct the jury on the elements of the special circumstance.

3. Structural Error versus Harmlessness Analysis

The trial court's failure to instruct on the elements of the special circumstance is subject to harmless error review. In *Merritt*, our Supreme Court held that an error to instruct on the elements of the offense was subject to harmlessness review "so long as the error does not vitiate *all* of the jury's findings." (*Merritt, supra* 2 Cal.5th at p. 829; cf. *Sullivan v. Louisiana* (1993) 508 U.S. 275, 281 [defective reasonable doubt instruction not subject to harmlessness review because it "vitiates *all* the jury's findings"].) In so doing, the court rejected as "artificial" the rule previously established in *People v. Cummings* (1993) 4 Cal.4th 1233, under which the omission of "'substantially all of the elements of an offense'" was reversible per se. (*Merritt*, at pp. 829, 825.)

In *Merritt*, a jury convicted the defendant of two robbery counts and found true firearm use allegations, after a trial that focused on the

perpetrator's identity. (*Merritt, supra*, 2 Cal.5th at pp. 821, 829.) The trial court failed to give the standard instruction on the elements of robbery, but it did instruct on the required mental state, the need to find the defendant's identity as the perpetrator, and the elements of the firearm allegation. (*Id.* at p. 822.) Our Supreme Court found the error amenable to harmlessness analysis because it did not vitiate *all* the jury's findings. (*Id.* at p. 829.) The court explained: "[The error] did not vitiate the finding that defendant acted with the mental state required for robbery. It did not vitiate the finding that he personally used a firearm during the commission of the offenses. Perhaps crucially, it did not vitiate the finding on the only *contested* issue at trial: defendant's identity as the perpetrator." (*Ibid.*)

The same analysis applies here. The trial court's failure to instruct on the special circumstance's elements did not vitiate all the jury's findings. As discussed, the murder verdicts necessarily entailed findings of intent to kill for each appellant. The jury also necessarily found that Gonzalez was killed. And similar to *Merritt*, the jury made affirmative findings on the only contested issue at trial—appellants' identity as conspirators or aiders and abettors in the shooting.

Unlike in *Merritt*, the identity issue was resolved before the jury reached the disputed charge—here, the special circumstance—when the jury found appellants guilty of murder. This distinction makes this case even more suitable for harmless error analysis, as there was *no* contested issue regarding the special circumstance. And we see no meaningful distinction between the trial court in *Merritt* instructing on a single element of the charge and the trial court here instructing on none (at least correctly). *Merritt* eschewed an "artificial" rule based on the proportion of omitted elements and instead focused on the effect of the error, asking whether it

25

vitiated *all* the jury's findings. (*Merritt, supra*, 2 Cal.5th at p. 829.) Because the error here did not do so, it is subject to harmless error analysis. (*Ibid.*)

4. Application of Harmless Error Review

The trial court's failure to instruct on the elements of the special circumstance was harmless beyond a reasonable doubt. "'[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.' [Citation.]" (*Merritt, supra*, 2 Cal.5th at p. 832.)

As discussed, none of the elements of the special circumstance were contested—defense counsel for both appellants focused exclusively on the question of the identity of the perpetrators, which the jury resolved in favor of the prosecution. (*Merritt, supra*, 2 Cal.5th at p. 832 [considering what jury necessarily found in assessing harmlessness].) The jury necessarily found that appellants acted with intent to kill. It also necessarily found that Gonzalez was killed. And it is indisputable that the direct perpetrator intentionally fired from a motor vehicle at a person outside the vehicle, killing Gonzalez.[13]

Appellants' only meaningful argument that the error was prejudicial rests on the contention that the verdicts did not reflect findings that they acted with intent to kill. But as shown above, the jury necessarily found at least that appellants conspired to kill Gonzalez. Accordingly, we conclude the error was harmless beyond a reasonable doubt.

_____

[13] Under Vehicle Code section 415, a motor vehicle is "a vehicle that is self-propelled," with some exclusions not relevant here.

## II.

### EVIDENTIARY CHALLENGE

Richee claims the trial court abused its discretion by admitting evidence of his inculpatory statement to Girlfriend. He contends the statement was inadmissible hearsay and so vague as to be irrelevant. He adds that the investigators' tactics during Girlfriend's interview rendered the evidence unreliable and therefore, again, irrelevant. As discussed below, we find no abuse of discretion.

*A. Background*

Two days after the shooting, officers pulled Girlfriend over on her way to work. She testified they ordered her out of her car, placed her in the backseat of a patrol car, and held her there for what "felt like hours," until the investigators arrived.

After investigators arrived, Girlfriend was moved to the front passenger seat of their car, where Investigator Martin Alfaro ordered her to "be quiet," told her she was "being detained," and warned that it was "not gonna go good for [her]" if she lied to him. Moments later, Alfaro told Girlfriend: "[Y]ou're not under arrest. You're free to leave. And one thing you're not gonna do—you're gonna tell the truth." He continued to issue emphatic warnings that Girlfriend must be truthful and forthcoming, and asked why she thought the investigators were there. Crying, Girlfriend said she thought it was because of a shooting. She began describing her arrival home the night of the shooting and her conversation with Richee regarding the smell of bleach. Alfaro interjected: "Don't beat around the bush. Protect yourself and your kids and your . . . mom. What else, what'd he tell you?" Girlfriend replied, "That he did it."

Before trial, the prosecution filed a motion in limine to rule appellants' out-of-court statements—including Richee's statement to Girlfriend—admissible as party admissions. At a hearing on the motion, Richee's counsel objected. Counsel argued that Girlfriend had not related a specific statement by Richee but instead provided a "synopsis" of their conversation. He contended the evidence did not qualify as the statement of a party opponent and was therefore inadmissible hearsay. Counsel noted that investigators had "pressured" Girlfriend. The trial court ruled the statement admissible, reasoning that it was clear what Girlfriend had been discussing with the investigators. The court remarked, "I agree that police officer was apparently using aggressive police tactics, which is what they do in these types of cases."

*B. Analysis*

The trial court did not abuse its discretion by admitting evidence of Richee's statement to Girlfriend. The evidence was admissible as a party admission, was relevant to the case, and was sufficiently reliable. We review the court's evidentiary rulings for abuse of discretion (*People v. Yates* (2018) 25 Cal.App.5th 474, 484), and we will not disturb the court's ruling unless it "'exceed[ed] the bounds of reason by being arbitrary, capricious or patently absurd'" (*People ex rel. Harris v. Black Hawk Tobacco, Inc.* (2011) 197 Cal.App.4th 1561, 1567).

The evidence of Richee's statement to Girlfriend was hearsay— "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."[14] (Evid. Code, § 1200, subd. (a).) Hearsay is generally inadmissible.

---

[14] The evidence of Girlfriend's statements to Alfaro—reporting

28

(*Id.*, § 1200, subd. (b).) But under the party admission exception, "[e]vidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ." (*Id.*, § 1220.) Because Richee was a defendant, evidence of his statement to Girlfriend was not inadmissible under the hearsay rule.

Richee argues that because Girlfriend's recounting of his statement was so general— "'[t]hat he did it'"—it did not constitute a "'statement'" under the Evidence Code and therefore was not a party admission. This contention is self-defeating: if the evidence were not of a "statement," then it would not be hearsay in the first place. (Evid. Code, § 1200, subd. (a).) Regardless, the evidence did concern a statement. As relevant here, a "'[s]tatement'" is simply an "oral or written verbal expression." (*Id.*, § 225.) Girlfriend's report to investigators concerned Richee's verbal expression to her, meaning that it was evidence of his "'[s]tatement.'" (*Ibid.*) Girlfriend's failure to convey the specific words Richee had used did not render the evidence inadmissible. (*People v. Riccardi* (2012) 54 Cal.4th 758, 832 [providing "succinct summary" of conversation, rather than "verbatim recounting," did not render evidence of party's statements inadmissible.])

The evidence was also relevant. Girlfriend acknowledged that she understood the investigators were questioning her about a shooting. In this context, when Alfaro asked what Richee had told her, Girlfriend's response— "[t]hat he did it"—could only have referenced Richee's admission to his involvement in the shooting. And a defendant's admission of guilt is highly

---

Richee's statement to her—was an additional layer of hearsay, but Richee does not challenge the admissibility of the evidence on that basis.

relevant. (*People v. Villasenor* (2015) 242 Cal.App.4th 42, 69–70 ["'confessions carry "extreme probative weight"'"].)

Finally, Richee's trial counsel did not raise an independent objection that the investigators' tactics rendered the evidence unreliable and therefore irrelevant. We nevertheless address the contention. Although we do not condone all of Alfaro's actions during the interview, we conclude the totality of circumstances supports the reliability of Girlfriend's statement to investigators.[15]

When asked why she thought the investigators were there, Girlfriend began crying and responded: "A shooting." This response strongly indicated that Girlfriend knew about Richee's involvement in the shooting. While Richee argues she might have known about the shooting from other sources, this would not explain why she would think the investigators wanted to talk to *her* about the shooting or why she was so emotional when acknowledging that fact. In any case, definitive proof of the matter was unnecessary. (Evid. Code, § 403, subd. (a)(1) [evidence that depends on preliminary fact is admissible if there is sufficient evidence to sustain finding that preliminary fact exists].)

_____

[15] Particularly troubling is Alfaro's conduct in ordering Girlfriend to be quiet, advising her that she was being detained, and warning that she would face consequences if she lied—without advising that she had no obligation to speak with him. In an apparent contradiction, Alfaro soon told her that she was in fact "free to leave," but he immediately followed this by insisting she was "*gonna* tell the truth." (Italics added.) Richee does not claim that the allegedly coercive nature of the interview rendered the evidence inadmissible per se, regardless of reliability. We therefore do not consider the issue.

Girlfriend's recorded reaction when left alone in the interview room, where she lamented that someone had placed her, her children, and her mother in a difficult position—without including Richee—supported a conclusion that she believed Richee was responsible, lending additional credence to her recounting of his admission. Finally, Girlfriend's statement was corroborated by the presence of a half-full bottle of bleach near the bathtub in her and Richee's shared apartment, consistent with her description of the discussion between them about the smell of bleach before Richee's admission. The circumstances therefore supported the reliability of Girlfriend's statement to investigators. Accordingly, we conclude the evidence was properly admitted.

## DISPOSITION

Appellants' convictions for attempted murder are reversed. Their convictions for murder are affirmed. Their sentences are vacated, and the matter is remanded. The People shall have 60 days from issuance of the remittitur to decide whether to retry appellants for attempted murder and related allegations or for any lesser included offenses. Following any retrial or decision not to retry appellants, the trial court shall resentence them accordingly. The court is reminded to impose any remaining victim restitution amount on appellants jointly and severally.

Upon resentencing, the trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


                                        O'LEARY, P. J.

I CONCUR:


MOTOIKE, J.

Moore, J., Dissenting and Concurring.

Prior to 2019, a person could generally be found liable for the crimes of murder and attempted murder (the nontarget offenses), if they conspired to commit some other crime (the target offense) and the crimes of murder or attempted murder were the natural and probable consequence of the target offense. (*People v. Hardy* (1992) 2 Cal.4th 86, 188–189.)

The Legislature has now effectively eliminated the natural and probable consequences doctrine as it relates to murder and attempted murder: "Malice shall not be imputed to a person based solely on his or her participation in a crime." (Pen. Code, § 188, subd. (a)(3).) That is, the malice required for murder or attempted murder (the nontarget offense), can no longer "be imputed to a person based solely on his or her participation in" some other crime (the target offense). (See Pen. Code, § 188, subd. (a)(3).)

Here, the trial court erroneously instructed the jury on the now defunct natural and probable consequences doctrine. However, the court instructed the jury that the target offenses were either murder or attempted murder, which both require a finding of malice.

Therefore, I would affirm the defendants' convictions for both murder and attempted murder because it seems to me that the jury could not have imputed a finding of malice based on the wording of the instruction.

In sum, I respectfully dissent, in part, from that portion of the opinion that reverses the defendants' convictions for attempted murder. In all other respects, I concur with the majority's analysis and holdings.


MOORE, J.


1